UNITED STATES of America, the State of New York, and UDC–Love Canal, Inc., Plaintiffs,

v.

HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.

No. CIV–79–990C.

United States District Court, W.D. New York.

May 13, 1991.

Supplemental Order No. 58 May 14, 1991.

Supplemental Order No. 59 May 17, 1991.

U.S. Dept. of Justice, Environmental Defense Section, Land and Natural Resources Div. (Lewis M. Barr and Craig D. Galli, of counsel), Washington, D.C., for plaintiff U.S.

Piper & Marbury (Thomas H. Truitt and Steven K. Yablonski, of counsel), Washington, D.C., for defendant Occidental Chemical Corp.

SUPPLEMENTAL ORDER # 57

CURTIN, District Judge.

Defendant Occidental Chemical Corporation ("OCC") has moved, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, to compel discovery from plaintiff United States of America ("United States") concerning any information, whether docu-

mentary or testimonial, that relates to the issue of whether the United States Army ("Army") dumped hazardous substances at the Love Canal landfill. OCC maintains that the circumstances of this dispute justify compelling the discovery notwithstanding any privileges that might otherwise have precluded access to the information. *See* Items 752–56; 788–89. The United States has responded by seeking a protective order authorizing it to continue withholding the information sought by OCC as protected by either the attorney-client or the work-product privilege. *See* Items 769; 770. The United States has also moved to compel the return of various privileged documents that it claims were inadvertently provided to OCC. *See* Items 775–76. Most recently, OCC has moved for sanctions in the form of either a finding that Army dumping of hazardous substances at Love Canal shall be considered established for all purposes in this litigation, *see* Items 788; 966, or the granting of an "adverse inference" or "rebuttable presumption" to the same effect, thereby forcing the United States to bear the burden of establishing that the Army did *not* engage in such dumping. *See* Item 1043.

The importance of the issue is clear: proof of Army dumping of hazardous substances as alleged by OCC in one of its counterclaims could render the United States strictly, jointly, and severally liable under Section 107(a)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3).

All submissions related to this issue have been filed under seal, and OCC seeks to have them unsealed and made part of the public record for use at trial.

### BACKGROUND

In a sworn statement taken by the Army on July 19, 1978, Frank Ventry, who formerly had worked at the Love Canal landfill as an employee of the City of Niagara Falls, reported that he recalled three separate occasions on which the Army had dumped some type of material at the site. *See* Item 789, Exhibit 27 at 1. In another sworn statement taken by the Army on July 21, 1978, Fred Downs reported that when he was a child he, too, had seen, and apparently had also heard about, dumping by Army personnel at the Love Canal landfill. *See id.*, Exhibit 28 at 1–2. In response to requests for an investigation of the issue of possible Army dumping at Love Canal, *see id.*, Exhibit 27 at 1; Exhibit 26 at 6, ¶ 7; Exhibit 29 at 1, the Army subsequently searched military records but found "no evidence of Army involvement in the contamination of Love Canal." *Id.*, Exhibit 29 at 1.

When inquiries from congressional and state officials continued, the Army conducted a further search of its records in July, 1978. *See id.*, Exhibit 26 at 2; Exhibit 29 at 1. The search was conducted by personnel from the Office of the Project Manager for Chemical Demilitarization and Installation Restoration. Later that month, a four-member board of officers was appointed to investigate whether the Army had indeed dumped toxic substances at Love Canal. As detailed in a report dated July 27, 1978, the officers' board concluded that the allegations were not substantiated by available information. *See id.*, Exhibit 26 at 21. On August 14, 1978, the Department of Army Headquarters issued a report summarizing the board's findings; the report indicated that there was "no evidence of direct Army involvement" at Love Canal as described by Ventry and Downs. *Id.*, Exhibit 29 at 18.[1]

In late December, 1979, or early January, 1980, an attorney with the United States Environmental Protection Agency ("EPA") named Richard Haas prepared a memorandum for Douglas MacMillan, who was then Director of the EPA's Hazardous Waste Task Force. That memorandum provides in relevant part:

> An informed source has indicated that the U.S. Army has more information about its conduct at Love Canal than its flat denial would indicate. This same

---

1. The New York State Assembly also investigated the issue of toxic contamination of the Niaga- ra Frontier region by the Army, and issued its own report in 1981.

source indicated cause for caution in how we go about getting the information if it still exists. If the Army had a role at Love Canal, which is widely suspected, we do not want to find out from Hooker. *See* Item 838, Declaration of Richard J. Haas, and attachment; Item 842, Appendix A at 2.

Sometime in early 1980, Barry Trilling, an attorney with the United States Department of Justice, learned that an employee of the EPA claimed to have information regarding the dumping of hazardous materials by the Army at Love Canal. At the time, Trilling was working in the Hazardous Waste Section of the Land and Natural Resources Division of the Department of Justice, and was lead counsel for the United States on the case at bar. Trilling conveyed the information to an attorney on his staff, David Dearing, and told him to investigate. At the time, Dearing had been working for the Department of Justice for approximately nineteen months.

Dearing subsequently prepared a memorandum to Trilling, dated April 3, 1980, and entitled "Allegations of Army Dumping at Love Canal." In the memorandum, Dearing reported that he had spoken to the alleged source of the information. According to Dearing, the informant, whom he identified in the memorandum only as "Mr. X," alleged that he had heard about Army dumping at Love Canal and that the Army might destroy documents that could verify the dumping had taken place in order to conceal that information from the public. Mr. X indicated that the source of all or much of his information was a friend of his, whom Dearing identified in the memorandum only as "Mr. Y." What follows is the portion of that memorandum provided to OCC years later:

> A former management level civilian employee of the Army ("Mr. X") has recently given me information which corroborates allegations that the Army dumped hazardous materials at Love Canal, specifically radioactive rocket fuel and a compound known as trichloraniline. He does not wish his name used in order that his current relationship with the

Army not be disturbed. Mr. X's experience' [sic] in environmental work, current position of employment and general demeanor lead the writer to believe that he is credible.

According to a friend of Mr. X, ("Mr. Y"), who is himself a former civilian employee of the Army, the Officers Board which investigated the Ventry/Downs allegations found documents at the Federal Records Center (Suitland) showing that the Army dumped radioactive rocket fuel at the Canal. [Footnote # 1] This fuel came from a Nike–Ajax missile site in or near Niagara Falls. Both the Board of Officers' Report and the followup Headquarters of the Department of the Army (HQDA) report discussed briefly the handling of radioactive materials in the area, but neither mentioned evidence of radioactive waste disposal in the Canal.

Mr. Y did not recall the specifics of the dumping nor exactly where in the records the dumping was mentioned. Mr. X stated that the officers' [sic] copied these documents, along with others which they used for their report. The copies are currently kept at the Aberdeen Proving Grounds, in a file cabinet located in Building E–4585. Mr. X said that the Army is very sensitive about this information because of potential tort liability, and will cause the documents to "disappear" if necessary.

I also asked Mr. X about dumping connected with the production of impregnite. [Footnote # 2] In response to my question, Mr. X said he knew nothing concerning the dumping of impregnite at Love Canal.

[Footnote # 1:] The writer did not speak directly to Mr. Y. The information attributed to Mr. Y was relayed to the writer by Mr. X[.]

[Footnote # 2:] Impregnite was produced for the Army at the Niagara Falls Army Chemical Plant, located at 3163 Buffalo Avenue. This plant was specifically designed, constructed and operated for the Army. The duPont company operated it under government contract from 1941–1945. When the plant was reopened in

1951 Hooker received the government contract and produced impregnite until May, 1953. Both the Officers' and the HQDA reports concluded that any wastes produced during duPont's operation of the plant were disposed of by duPont employees in a dump site owned by duPont. Neither report drew any definite conclusions concerning the site where wastes were dumped during Hooker's operation of the plant. The HQDA report absolved the Army of responsibility for the dumping during this latter period, while the Officers' report found "some doubt" about who carried out the dumping.

Item 752, Exhibit 12 ("X & Y memorandum"). According to a sworn declaration of one of the four former members of the officers' board, Andrew Anderson, the documents that the board considered relevant to its investigation were, in fact, initially stored in a file cabinet in building "E4585" at the Aberdeen Proving Ground. *See* Item 770, Appendix A at ¶¶ 1–3.[2]

It appears that Trilling, upon reading the memorandum, did not consider the allegations credible because it was his understanding that there was no such thing as "radioactive" rocket fuel, and that the actual deployment of Nike–Ajax missiles did not coincide with the time frame described by Mr. X.

On June 5, 1980, Dearing met with Army representatives at the Aberdeen Proving Ground. According to another memorandum prepared by Dearing, dated June 27, 1980, he met with five Army representatives, four of whom had worked on the Army's own investigation and were thus familiar with the documents examined at that time. *See* Item 752, Exhibit 19 at 1.[3]

Dearing's June 27 memorandum indicates that, without revealing the source of his information, he asked the Army officials about Mr. X's allegations. The memorandum indicates that none of them recalled seeing any documents supporting the allegation regarding radioactive rocket fuel. One of the Army representatives did confirm, however, that impregnite residue in the form of trichloraniline had been dumped in the Gunpowder River at Aberdeen—an allegation contained in the portion of the X & Y memorandum that was not disclosed to OCC.[4] Dearing's memorandum also reports that he was given three boxes of documents at the close of the meeting, and that he was allowed to take them off the premises. He was told that the boxes contained all the documents that had been gathered and brought to Aberdeen by Army investigators, but that had not been included among the exhibits to the Army report. *Id.* at 2. Dearing also noted that an EPA summer intern had examined the documents, but that the intern had "found nothing extraordinary." *Id.*[5]

In a memorandum dated October 2, 1980, Donald Pugh, who had been a member of the officers' board and who also had been present at the June 5 meeting with Dearing, questioned the adequacy of the Army's investigation of dumping at Love Canal. Among other things, Pugh stated that insufficient efforts had been made to obtain information from residents in the area, and that he felt the officers' board itself "generally believed the investigation was inadequate." *See* Item 789, Exhibit 33 at 1.

The record also includes an undated note from Mitchell Burack to Jim Bunting, both EPA lawyers at the time, indicating that Burack had interviewed an unidentified res-

---

2. Anderson also indicated that he had not been involved in the records search that had discovered the documents ultimately reviewed by the officers' board. *See* Item 770, Appendix A at ¶ 2.

3. The memorandum was directed to Anthony Roisman, who at the time was the Chief of the Hazardous Waste Section of the Land and Natural Resources Division of the Department of Justice. Roisman had supervisory responsibility for the Love Canal litigation and is the person to whom Trilling reported regarding matters pertaining to the case.

4. It appears that trichloraniline is a by-product of the Army's impregnite-manufacturing process.

5. The record also indicates that Dearing conducted searches at the National Archives and the National Records Center at Suitland, Maryland, but found no records documenting Mr. X's allegations. *See* Item 770, Appendix D at ¶ 11.

ident who claimed to have witnessed Army dumping, and also that a woman identified in the note as "Ms. Preuster" claimed to know about "radioactive wastes" deposited by "the U.S. government." *See* Item 789, Exhibit 31.

In 1984, following an approximately four-year discovery moratorium to which the parties had agreed, OCC served its first set of interrogatories and document requests. Among other things, OCC sought the following:

18. The State Assembly Report states at page 75 that "impregnite stocks (at the Northeast Chemical Warfare Depot)" were high" [sic] at the end of World War II and that "the ultimate disposition of this surplus material" has not been determined.

(a). State all facts, knowledge and other information relating to the disposition of impregnite stocks by or for the United States in the Niagara Frontier region from 1940 to 1955.

(b). Produce all documents referring or relating to the subject matter of this interrogatory....

(c). Identify all persons with knowledge relating to this interrogatory.

Item 752, Exhibit 1 at 30–31. In addition, interrogatories 22 and 23 sought the identity of any person having knowledge of documents reviewed by the Army's board of officers and headquarters; interrogatory 25 requested a description of all actions taken by the United States to investigate past activities of any party even potentially relating to Love Canal, as well as the identification of any documents referring or relating to, or of any persons with knowledge of, such investigations; and interrogatory 34 sought all documents relating to the United States' activities in the Niagara Frontier region from 1940 to 1955 that were located at the Aberdeen Proving Ground, as well as the identity of any person having knowledge of the existence or destruction of such documents. *See id.*, Exhibit 1 at 33–34, 40. Finally, interrog-

atory 35 sought production of any documents not otherwise requested that referred or related to the disposal of wastes by anyone in the Niagara Frontier region from 1940 to 1955. *See id.*, Exhibit 1 at 41.

In order to assist the United States in responding to these discovery requests, the Army assigned Captain Mitchell Herr to locate all pertinent documents. During his investigation, Herr discovered the X & Y memorandum; he then contacted Dearing about the allegations contained therein. According to a memorandum subsequently prepared by Herr, dated October 26, 1984, Dearing confirmed that he believed Mr. X to be credible [6] but explained that, pursuant to Mr. X's request, he did not wish to reveal Mr. X's identity. At Herr's request, however, Dearing agreed to contact Mr. X and to have Mr. X contact Herr. Herr's memorandum indicates that, during an ensuing telephone conversation, Mr. X told Dearing that he "had only the haziest recollection of meeting Dearing," and that he could only recall having a "vague suspicion" in the past that the Army had concealed documents. Mr. X also told Dearing that he could not remember the identity of Mr. Y. According to Herr's memorandum, Dearing agreed that the allegations detailed in the X & Y memorandum were "now a dead issue." The memorandum does not explain, however, why Dearing did not have Mr. X contact Herr as planned. Herr also contacted another Army officer who had participated in the Army's search for documents in 1978. The officer indicated that he believed Mr. X's allegations to contain several inaccuracies, including that, to the best of the officer's knowledge, there had never been a radioactive rocket fuel. The officer told Herr that he was "extremely skeptical that any 'cover-up' of Army involvement occurred." *See* Item 752, Exhibit 11 at 1. Herr concluded that the information provided by Mr. X was unfounded, and that there was no reason to doubt that the Army had made all relevant documents in its control available to him

---

6. The memorandum does not make clear whether Dearing still believed Mr. X to be credible at the time he was contacted by Herr, or whether

Dearing was indicating that he considered Mr. X to be credible at the time of their 1980 meeting.

and to the Department of Justice. *Id.*, Exhibit 11 at 2.

Satisfied that Mr. X was not a credible source of information, the United States did not reveal to OCC: the identity of Mr. X; the existence of Mr. X or Mr. Y; the substance of Mr. X's allegations; any documents referenced in the X & Y memorandum; or any other sources of information relating either to Mr. X's allegations or to investigations concerning the allegations. The United States also did not disclose the identity or existence of Haas's "informed source," or the contents of the undated Burack note.

On July 14, 1988, after OCC had discovered many documents in various government repositories that it considered relevant to the issue of Army dumping but that had not previously been provided, representatives of the United States and of OCC met to discuss the status of document production and other discovery. At that meeting, the United States provided OCC with a number of documents detailing the investigation it had conducted in 1984 in response to OCC's discovery requests. Inadvertently included among those papers was the 1984 memorandum prepared by Herr. *See* Item 770, Appendix G at ¶ 2. Upon examining Herr's memorandum, OCC asked the United States to provide the X & Y memorandum and the documents referenced therein, and to identify Mr. X and Mr. Y.

Approximately ten weeks later, the United States furnished OCC with a redacted copy of the X & Y memorandum, the contents of which are detailed above. Asserting the work-product privilege, however, the United States refused to provide an unredacted copy of the document. The United States advised OCC that it did not have any documents corroborating allegations of Army dumping at Love Canal, and that it did not know the identity of either Mr. X or Mr. Y. By the time the United States made the latter representation, Dearing no longer worked for the Department of Justice. It appears either that Dearing never preserved Mr. X's identity or that, if he did, any such documentation was itself never preserved.

OCC then deposed Dearing on September 30, 1988. At that time, Dearing identified Mr. X as a former employee of the EPA named Glenn Shira. Dearing testified that he had interviewed Shira at his EPA office shortly before writing the X & Y memorandum, but never learned the identity of Mr. Y from Shira or from any other source. Dearing also testified that, after discussing Shira's allegations with Trilling, he arranged a meeting with Army representatives at the Aberdeen Proving Ground to investigate Mr. X's allegations. Dearing testified that at the meeting he asked for any documents at Aberdeen concerning the issues raised by Mr. X, and that he was given three boxes of documents. He also recounted the telephone conversation he had had with Shira in 1984 at Captain Herr's request. Dearing testified that he ultimately concluded that Shira simply did not know what he was talking about with regard to alleged Army dumping at Love Canal and the possible destruction of related documents.

In a sworn statement provided in December, 1988, Paul Des Rosiers, who had worked with Shira for several years at EPA, stated that on "several" occasions Shira had told him he had heard about documents at Aberdeen verifying that the Army had dumped hazardous substances at Love Canal. Des Rosiers also stated that Shira had told him the Army was "sensitive" about the subject, and, due to the Army's concern about possible liability, the documents might "disappear." *See* Item 770, Appendix E at ¶¶ 2–4.[7] In another sworn statement supplied in December, 1988, Robert Charles Morgan, formerly the National Case Advisor of the EPA's Hazardous Waste Enforcement Task Force and the EPA's chief technical case coordinator for the Love Canal site, stated that he had spoken with Shira on May 29, 1980. Based on his contemporaneous diary entries, Mor-

---

7. Des Rosiers also noted that he considered Shira merely to be boasting and speculating. *See* Item 770, Appendix E at ¶ 5.

gan stated that he and Shira had discussed the Army's files at Aberdeen. Morgan also stated that on that day allegations were made regarding the possible destruction of Army records, but that he could not recall whether the allegations had been made by Shira or by Des Rosiers, with whom he had also spoken that day. Morgan's statement also indicates that on the same day he had discussed with a representative of the Department of Defense the issue of whether the Army had additional information about Love Canal. *See* Item 822, Declaration of Robert Charles Morgan at ¶¶ 1–8. In addition, later that day Morgan sought legal advice from representatives of the Department of Justice, including Trilling, concerning "the possible existence of additional Army materials, the allegations of Mr. Shira, and the report issued by the New York State Assembly Task Force." *Id.* at ¶ 9. In a sworn statement executed in May, 1989, Richard Haas indicated that he believed Shira was the "informed source" to whom he had referred in his memorandum. He also indicated that shortly before writing the memorandum he had met with both Shira and Des Rosiers, and that Shira had made allegations regarding Army dumping at Love Canal and the destruction of documents. *See* Item 838, Declaration of Richard J. Haas at ¶ 4.[8]

Following oral argument on May 12, 1989, the court determined that further discovery was necessary in order to resolve the pending motions. *See* Item 876. Pursuant to the court's order, nine additional witnesses were deposed, including Shira. Contrary to Dearing's testimony, Shira denied at his deposition that he was Mr. X.

He also denied that he was Mr. Y and could not recall ever meeting Dearing, although he stated that his records indicated that he had spoken with Dearing by telephone in March, 1980.[9] Although Dearing testified that he had contacted Shira by telephone in 1984, Shira testified that, after his telephone conversations with Dearing in 1980, he did not recall having contact with anyone from the Department of Justice until 1988.

Shira has consistently denied that he is Mr. X. The United States insists that Shira is lying and that he is, in fact, Mr. X, and that no "Mr. Y" ever existed. The United States contends that Shira himself was the only source of the allegations that he conveyed to Dearing regarding the possibility of Army dumping and the destruction of documents, and that, for some as-yet-unexplained reason, he thus was lying to everyone with whom he spoke regarding the matter.

### DISCUSSION

The United States contends that OCC's motions rest upon "unsubstantiated allegations" regarding the destruction of documents by government personnel, and that OCC has not "conclusively demonstrated" that such documents ever existed in the first place, or that, if they ever did exist, they were destroyed. *See, e.g.,* Item 1058 at 2, 7. That argument, however, misses the point of OCC's argument. OCC does not claim that it has authenticated these allegations. Rather, OCC argues that its chances of determining whether the allegations are true have been hampered, if not

---

8. Haas also did not put much stock in the allegations, stating that he considered them "far-fetched." *See* Item 838, Declaration of Richard J. Haas at ¶ 4.

9. The difficulties that have arisen due to the United States' failure to preserve adequately the identity of Mr. X and the circumstances of his disclosures to Dearing were reflected at the oral argument held on December 4, 1990. Counsel for the United States argued that the X & Y memorandum was based on telephone conversations that Dearing had recently had with Mr. X, and that Dearing, prior to writing the memorandum, had not met Mr. X. *See* Item 1082 at 20–21. At his deposition and in a subsequent

sworn written statement, however, Dearing stated unequivocally that he had met with Mr. X at Mr. X's EPA office prior to writing the memorandum. *See* Transcript of September 30, 1988, Deposition at 69–70; Item 770, Appendix D at ¶ 5. When pressed on this point by the court at oral argument, counsel for the United States insisted, curiously, that Dearing may not have meant that he had had a face-to-face meeting with Mr. X. *See* Item 1082 at 40. Similarly, the United States mistakenly refers in one of its memoranda to Dearing's trip to the Aberdeen Proving Ground and to his June 5, 1980, meeting with Army officials as two separate events. *See* Item 770 at 10–11.

nullified, by the collective failure of the Department of Justice and the Army to take adequate and timely steps to ensure that such documents were preserved if, in fact, they ever existed.

The court has concluded that the combination of the inadequate manner in which the Department of Justice initially investigated the allegations contained in the X & Y memorandum, and the failure to reveal any information regarding those allegations in response to OCC's 1984 discovery requests, dictates that OCC's motion to compel must, for the most part, be granted, and that the filings related to the present motions be unsealed.

With regard to its initial investigation in 1980, the United States seems to have been guilty of a disturbing naïveté when faced with the task of determining whether the Army did, in fact, possess documents pertaining to the allegations described in the X & Y memorandum. Put somewhat more charitably, the United States clearly did not take adequate account of differing institutional perspectives when it began its investigation. Even assuming *arguendo* that there was no conflict of interest as a matter of law, the Department of Justice should have looked at the situation from the Army's perspective. Even if Dearing and the other Department of Justice attorneys involved had seen themselves as also representing the interests of the Army, prudence should have dictated that they assume the Army, at least initially, would not. Consequently, when Dearing went to the Aberdeen Proving Ground seeking documents relating to the possibility that the Army had dumped hazardous substances at Love Canal, he should have assumed that the Army representatives to whom he would make the request would not consider his arrival to be particularly good news. It thus was, to say the least, imprudent for the Department of Justice not to take additional steps beforehand to ensure that, if they existed, any such documents would remain secure until Dearing was able to gain access to them. Instead, the Department appears simply to have relied on Army personnel to produce all documents in the Army's possession that might reveal

that the Army itself had contributed to the chemical contamination at the Love Canal landfill.

While it may well be, as the United States contends, that no such documents ever existed, the manner in which this investigation was carried out may have ruined any chance that OCC—or, for that matter, the court—had to determine the truth of the allegations contained in the X & Y memorandum. Even though the only Department of Justice attorney who had met Mr. X initially had considered him credible, and even though the Department took the allegations seriously enough to investigate further, it seems that no one considered the possibility that Mr. X might be right, and that, consequently, the Army might attempt to destroy documents.

With regard to OCC's 1984 discovery requests, the court finds that the information reflected in the X & Y memorandum, as well as related sources of information pertaining to Mr. X's allegations and to the associated investigations conducted by the United States, clearly fell within the interrogatories and document requests cited above. Indeed, that is presumably why Herr and Dearing re-examined the information in 1984. The court thus finds that it was improper for the United States, based on its internal and unilateral evaluations of the credibility of its informant and the plausibility of his allegations, not to disclose Mr. X's identity and his allegations to OCC. If the United States still felt bound by Dearing's promise not to reveal the identity of a man its attorneys felt had sent them on a meaningless search for documents, it should have at least come to the court for guidance on how to proceed. Whether or not the United States believed the allegations is not the point. The point is that the United States should not have acted as if no allegations had ever been made.

Finally, in light of the nature of the allegations contained in the X & Y memorandum, and considering the United States' failure either to take adequate precautions in 1980 against the possible destruction of documents, to reveal to OCC in 1984 the

allegations made by Mr. X, or to preserve Mr. X's identity, the court finds that the public has an acute interest in this particular battle being fought on the public record.

The court is well aware of the practical difficulties caused by the relatively rapid turnover of personnel at government agencies such as the Department of Justice. Furthermore, it appears that the investigation begun by the Department of Justice in 1988 was undertaken in the utmost good faith. But the steps taken by the Department of Justice in 1980 to investigate the allegations described in the X & Y memorandum reflect what appears to have been an almost naïve approach to the possible conflicts between its litigation interests and responsibilities and those of the Army. In this regard, it bears emphasizing that the role of the Department of Justice is to do precisely what its name implies—justice. Depending on a given set of circumstances, however, other government departments or agencies may have drastically different perspectives. That is not to say that base motives must always be attributed to other departments or agencies; rather, the point is that the Department of Justice must be particularly sensitive to the possibility that other departments and agencies may be more instinctively inclined to place their own relatively narrow interests first.

Furthermore, the court does not question the sincerity of the Department of Justice attorneys who concluded in 1984 that Mr. X was not a credible source of information. Rather, their mistake was in presuming that their unilateral judgment made it unnecessary to divulge the information they possessed in a more timely manner in response to OCC's discovery requests.

As imperfect a vehicle it may at times seem for the task, a trial is our judicial system's primary vehicle for discovering the truth. Fundamental fairness dictates that OCC at least be given the opportunity to develop at trial its claim that pertinent documents were destroyed, notwithstand-ing the fact that to do so it will be utilizing materials and information to which it ordinarily would not be entitled due to their privileged nature.

Accordingly, OCC's motion to compel discovery is granted as follows: 1) the United States shall produce to OCC forthwith unredacted copies, including appendices, of all documents submitted to the court for *in camera* review in connection with the pending motions; 2) with regard to privileges or other protections that may otherwise have been fully available to the United States in connection with testimony by current or former employees, the court will grant OCC considerable leeway in examining witnesses who are called at trial to establish the Army dumped hazardous substances at Love Canal, the identity of Mr. X, or the steps that were or were not taken to investigate Mr. X's claims. In addition, all submissions related to this issue that have been filed under seal shall be ordered unsealed. Finally, if any documents listed by OCC in Item 752 at page 20, Request for Relief # 5, have not previously been submitted for *in camera* review, the United States shall do so forthwith.

The court notes that OCC is clearly going too far in suggesting that the present record establishes either that the documents referenced in the X & Y memorandum ever, in fact, existed, or that, if they did, they were knowingly destroyed. Indeed, at the oral argument on May 12, 1989, counsel for OCC conceded as much. *See* Item 844 at 37. It is thus too early to consider whether any of the sanctions sought by OCC are justified.[10]

The court notes that the sealed filings of the United States have been submitted in a somewhat piecemeal fashion. In order to ensure that the record is accurate, the United States shall provide the court by May 21, 1991, a single inventory of its previously sealed filings, indicating docket-sheet item numbers for the filings and a brief description of the document or documents contained within each one. OCC

---

10. The court notes that the United States has indicated it will seek a rebuttable presumption in its favor with regard to OCC's other counter-claim due to OCC's acknowledged destruction of documents in 1983. *See* Items 861–62; 1058 at 7 n. 4.

shall do the same for its filings. Furthermore, in order to ensure that the court's decision today does not unduly prejudice the United States, this order shall be filed under seal and stayed until May 14, 1991, at 2:00 p.m., or until such other time as the court hereafter orders, so that the United States may bring to the court's attention any extraordinary circumstances relating to particular documents that may justify modifying the court's order by either exempting particular documents or by allowing the United States to supply redacted portions of particular documents for the public record. Furthermore, all parties are hereby directed to keep the contents of this order strictly confidential until the court directs that the stay be lifted and this order unsealed.

This order will not be stayed, however, with regard to the responsibility of the United States to provide forthwith: 1) an unredacted copy of the X & Y memorandum to OCC; and 2) *in camera* submissions of any documents listed by OCC in Item 752 at page 20, Request for Relief #5, that have not previously been filed. OCC shall, however, keep the contents of the X & Y memorandum strictly confidential until the court directs that the stay otherwise be lifted and this order unsealed.

In sum: OCC's motion to compel is granted to the extent indicated above; OCC's motion for sanctions is denied at this time; and the United States' motion for a protective order is denied. In addition, all submissions related to this issue that have been filed under seal shall be unsealed. Finally, if any documents listed by OCC in Item 752 at page 20, Request for Relief #5, have not previously been submitted for *in camera* review, the United States shall do so forthwith. This order shall be filed under seal and stayed to the extent indicated above until May 14, 1991, at 2:00 p.m., or until such other time as the court hereafter orders. Furthermore, all parties are hereby directed to keep the contents of this order strictly confidential until the court orders that the stay be lifted.[11]

So ordered.

### SUPPLEMENTAL ORDER #58 OF MAY 14, 1991.

Supplemental Order #57 shall be unsealed at 2:00 p.m. today. In addition, the full X & Y memorandum, a copy of which is appended to this order, shall also be made part of the public record.

Having met today with counsel for OCC and for the United States, the court finds good cause for retaining the balance of the documents at issue under seal. Accordingly, all parties are hereby directed to keep the contents of those documents strictly confidential until further order of the court.

So ordered.

### APPENDIX

#### Memorandum

Subject

Allegations of Army Dumping at Love Canal

Date

April 3, 1980

To

Barry J. Trilling

From

David E. Dearing

A former management level civilian employee of the Army ("Mr. X") has recently given me information which corroborates allegations that the Army dumped hazardous materials at Love Canal, specifically

11. Over the objection of the United States, *see* Item 1090, trial exhibit 2729A was reviewed by the court. That document, a complete copy of an internal memorandum of the New York State Department of Health prepared by Dr. David Axelrod, shall now be returned to the State of New York and shall not be disclosed to OCC. *See* Item 1090. The court examined the document to determine whether it contained information that would be helpful in resolving the present motions. The portion of the document redacted from trial exhibit 2729 was ruled by the Special Master to be protected by the deliberative privilege, and that ruling was never challenged. Moreover, the gist of OCC's motion goes to the adequacy of the United States' efforts to insure the preservation of relevant evidence, and the information contained in the redacted portion of the memorandum does not bear on that issue.

radioactive rocket fuel and a compound known as trichloraniline. He does not wish his name used in order that his current relationship with the Army not be disturbed. Mr. X's experience in environmental work, current position of employment and general demeanor lead the writer to believe that he is credible.

According to a friend of Mr. X, ("Mr. Y"), who is himself a former civilian employee of the Army, the Officers Board which investigated the Ventry/Downs allegations found documents at the Federal Records Center (Suitland) showing that the Army dumped radioactive rocket fuel at the Canal.[1] This fuel came from a Nike–Ajax missile site in or near Niagara Falls. Both the Board of Officers' Report and the follow-up Headquarters of the Department of the Army (HQDA) report discussed briefly the handling of radioactive materials in the area, but neither mentioned evidence of radioactive waste disposal in the Canal.

Mr. Y did not recall the specifics of the dumping nor exactly where in the records the dumping was mentioned. Mr. X stated that the officers' copied these documents, along with others which they used for their report. The copies are currently kept at the Aberdeen Proving Grounds, in a file cabinet located in Building E–4585. Mr. X said that the Army is very sensitive about this information because of potential tort liability, and will cause the documents to "disappear" if necessary.

I also asked Mr. X about dumping connected with the production of impregnite.[2] In response to my question, Mr. X said he knew nothing concerning the dumping of impregnite at Love Canal, but that impreg-

nite residue-trichloraniline—had been dumped in a tributary of the Gunpowder River at Aberdeen. He explained that impregnite was applied to Army clothing at Aberdeen at some point in the past, essentially by washing the clothing in the impregnite. The residue remaining—trichloraniline—was dumped in a small creek which runs into the Gunpowder River. The bottom of the river is covered with trichloranaline as a result.

Recently, Mr. X said the Army became concerned about trichlororaniline after quantities of it were found on the ground at Fort Benning, Georgia. A "short study" conducted by or for the Army found that the substance produces cancerous tumors in male mice and rats. A more extensive study, designed to determine whether bottom-feeders in the Gunpowder River have ingested trichloroaniline, has not yet been completed. Mr. X feels that the Army will probably keep these tests secret because of its concern about tort liability. (Commercial fishermen use the river)

After speaking with Mr. X, the writer examined a "technical monograph" on the operation of the Buffalo Avenue prepared by E.W. Rideout for duPont in 1951 and revised by F.T. Olotka for Hooker in 1953. This monograph was one of the documents examined by the Army investigators and was included by the Army in a compilation of such documents sent to me by Assistant General Counsel Donald Hemke. The monograph describes aniline, the raw material from which impregnite is made, as a "highly toxic chemical * * * [which] can enter the body either by inhalation of the flames or by absorbtion through the skin." The report also describes a sludge resulting from impregnite production as having "the

---

1. The writer did not speak directly to Mr. Y. The information attributed to Mr. Y was relayed to the writer by Mr. X.

2. Impregnite was produced for the Army at the Niagara Falls Army Chemical Plant, located at 3163 Buffalo Avenue. This Plant was specifically designed, constructed and operated for the Army. The duPont company operated it under government contract from 1941–1945. When the plant was reopened in 1951 Hooker received the government contract and produced impregnite until May, 1953. Both the Officers' and the

HQDA reports concluded that any wastes produced during duPont's operation of the plant were disposed of by duPont employees in a dump site owned by duPont. Neither report drew any definite conclusions concerning the site where wastes were dumped during Hooker's operation of the plant. The HQDA report absolved the Army of responsibility for the dumping during this latter period, while the Officers' report found "some doubt" about who carried out the dumping.

same toxic properties as aniline." The monograph states that sludge from the plant "is *carted to a dump* and discarded," adding that the material should be buried because *"children playing around the dump* might be affected." [emphasis added] A later discussion in the monograph adds that the sludge was "sent to the dump in *iron* drums." [emphasis added]

## II. Conclusions and Recommendations

Although none of this information is conclusive, it does offer support for the allegations made by Ventry and Downs. References in the monograph to a specific dump where children played suggests either the Canal or the 102nd Street site. Both sites were used by Hooker during this period and both, more so than S–Area or Hyde Park, were likely to be informal playground areas for children. The "iron drums" mentioned by the monograph could have been the "lead or zinc" covered drums which Ventry claimed the soldiers left at the Canal. Furthermore, Ventry quoted the soldiers as telling him that the drums came from the Buffalo Avenue plant.

The possibility that the impregnite dumping allegations are true does not affect our actions against Hooker at either the Canal or 102nd Street. Even if the Army were responsible we could not name it as a defendant because of constitutional restrictions. Nor would the presence of impregnite affect the relief sought, since remedial efforts aimed at other toxic chemicals should be equally effective against impregnite.

The possible presence of trichloroaniline at other locations is a matter of serious concern. If Mr. X is correct, the consumption of fish or water from impregnite—contaminated locations is potentially hazardous. As a first step, we should contact EPA to determine whether it has performed or is aware of any studies concerning the toxicity of the chemical. If this proves unfruitful, we should ask EPA to consider performing a trichloroaniline study. We should only request the results of the Army study as a last resort, since

such a request would be likely only to cause the Army to conceal further its impregnite dumping. Once the toxicity or non-toxicity of trichloroaniline is determined, our next step should be to determine where the chemical was dumped and what remedial actions are necessary.

Mr. X's information also offers support for the allegations made by Arthur Woolston–Smith, a private investigator employed by the New York legislature, that the Army dumped radioactive materials in the Canal and that records of such dumping are located at the Records Center in Suitland. The presence of radioactive materials would greatly affect our requested relief at the Hooker sites, since special remedial efforts would be necessary to protect against radiation leakage. Therefore, we should make an effort to determine definitely whether such materials were dumped and, if so, the location of the dumpsite(s). We should (1) obtain copies of Woolston–Smith's documents, by subpoena if necessary and (2) search the relevant records at Suitland to locate any additional documents which may prove useful. The attachments to the HQDA report on dumping allegations include a list of the records examined by the Army investigators; this list should serve only as our starting point for a search at Suitland since the investigators may have failed to include any records of radioactive material disposal on the list.

As an interim measure, we should request that EPA test the Canal and 102nd Street for radiation.

SUPPLEMENTAL ORDER # 59 OF
MAY 17, 1991.

The United States has informed the court that, with one exception, it has no objection to the unsealing of the balance of the documents at issue. The court thus orders that the following filings be unsealed forthwith: Items 752, 753, 754, 755, 756, 769, 770, 775, 784, 785, 787, 788, 789, 817, 822, 838, 841, 842, 844, 849, 850, 854, 876, 916, 966, 968, 974, 975, 1043, 1058, 1078 (sealing envelope containing 787 and 788), 1082, 1084, 1090, 1091, 1094.

The court notes that the thorough, expeditious, and forthright manner in which

counsel for the United States has responded to the court's order of May 13, 1991, has minimized the time necessary to produce the relevant documents to OCC and to unseal the filings listed above.

The United States has requested that the memorandum of law and attachments filed as Item 776 remain under seal, noting that that document does not relate to allegations of Army dumping or the related destruction of documents. OCC does not object to that filing remaining sealed, indicating its belief that the issues addressed by that document should be taken up in Phase II. The court thus directs that Item 776 remain under seal.

So ordered.